James T. Mitchell
Guam Police Department
233 Central Avenue
Tiyan, Guam 96913
(671) 475-8509   (671) 472-4036 (fax)
email: james.mitchell@gpd.guam.gov
Attorney for defendants Artui and Anciano

# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| **JAMES L. ADKINS**,<br>    Plaintiff,<br><br>vs.<br><br>**ALICIA G. LIMTIACO, etc., et al.**,<br><br>    Defendants. | Civil Case No. 09-00029<br><br>**DEFENDANTS SERAFINO ARTUI'S AND D.B. ANCIANO'S REPLY TO PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS** |

"A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (citing *Siegert v. Gilley*, 500 U.S. 226, 232, (1991)), *modified by Pearson v. Callahan*, 555 U.S. ___, 129 S.Ct. 808 (2009).

## DISCUSSION

Nowhere in any of his oppositions to the motions to dismiss filed by any defendants does Mr. Adkins dispute their reading and interpretation of his complaint. Mr. Adkins does not dispute the following reading of his complaint by Officers Artui and Anciano:

> As may reasonably be inferred from an objective reading of Adkins' complaint, a satellite scene had now developed in orbit around the accident with the green truck. Now Adkins was arguing with *two* police officers, that 'there's no law against taking pictures.' (FAC ¶ 14). By the terms of his own complaint, Adkins was arguing with two police officers about whether he could or could not take photographs of an accident scene while it was being investigated. And when, according to Adkins' complaint, they demanded that he turn over his cell phone, which now contained *evidence* of that accident or crime scene, Adkins refused.

And it was then that the "second officer demanded that plaintiff get out of his car." This is Adkins' chronology of the events. [¶] But Adkins knew the law, he says, and rather than comply with an officer of the law and get out of the car, in what he must have believed was an act of civil disobedience, Adkins declared, '*The only way I will get out is if I am under arrest*.' So it was that Adkins was arrested. These are the facts from Adkins' complaint. These are his words."

*Artui and Anciano's Motion to Dismiss* (Doc. 30), p. 9.

As anticipated, originally arguing that his arrest was unconstitutional because there was not probable cause to arrest him for "failure to comply," Mr. Adkins now focuses entirely on the question whether there was "reasonable suspicion" in a "Terry stop" sense, to stop his vehicle in the first place, and to tell him he was not permitted to take photographs and to move on. His argument is that if the police had no right to stop him in the first place – to tell him he could not take photographs and to move on – then everything that followed – from his argument with the first police officer that "there is nothing wrong with taking pictures" (FAC ¶ 13), to his argument with the second officer that "there's no law against taking pictures" (FAC ¶ 14), to being ordered to hand over his camera containing evidence, to being ordered out of his car, to being arrested for refusing to comply and exit his vehicle – then all of it was unlawful. The more creative Mr. Adkins becomes in order to salvage his complaint from dismissal, the more obvious it is that the law is not clearly established.

Judging solely by the well-pleaded facts in the complaint as supplemented by his argument in opposition, it is clear, assuming a Terry stop analysis even applied,[1] that Mr.

---

[1] What Mr. Adkins describes in his complaint when the first officer walked over and told him to stop taking photos does not even qualify as a Terry stop. Somewhat analogous, the two are not precisely the same. "[C]ircumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police. To be sure, the aura of authority surrounding an armed, uniformed officer and the knowledge that the officer has some discretion in deciding whether to issue a citation, in combination, exert some pressure on the detainee to respond to questions. But other aspects of the situation substantially offset these forces. Perhaps most importantly, the typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate

2

Adkins' presence at the scene of an accident – in close enough proximity for one, then two, officers to walk over and tell him to stop taking photographs – gave the officers "reasonable suspicion" that Mr. Adkins was in the process of committing the offense of obstructing governmental operations, or about to do so again if he remained. *See* 9 GCA § 55.45 ("A person commits a misdemeanor if he intentionally obstructs, impairs or perverts the administration of law or other governmental function by force, violence, *physical interference or obstacle*, breach of official duty, or any other unlawful act…") (emphasis added). Mr. Adkins was ordered to stop taking photos and to move away from the scene of an accident still under investigation, an obvious "governmental operation" for police officers. All that is required for the officers to approach him and tell him to stop, was "reasonable suspicion" that his presence might have been a "physical interference or obstacle." Mr. Adkins' pleadings are the best evidence of that.

A police officer's responsibility to direct traffic around the scene of an accident, to secure it until the investigation is completed, unquestionably gives the officer authority to protect it from "physical interference or obstacle." *See again* 9 GCA § 55.45. The first officer to approach

---

means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse. The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability. In short, the atmosphere surrounding an ordinary traffic stop is substantially less "police dominated" than that surrounding the kinds of interrogation at issue in *Miranda* itself, see 384 U.S., at 445, 491-498, 86 S.Ct., at 1612, 1636-1640, and in the subsequent cases in which we have applied *Miranda*. [¶] In both of these respects, the usual traffic stop is more analogous to a so-called "Terry stop," *see Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), than to a formal arrest. Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose "observations lead him reasonably to suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to "investigate the circumstances that provoke suspicion." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975). "[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.' " *Ibid*. (quoting *Terry v. Ohio*, *supra*, 392 U.S., at 29, 88 S.Ct., at 1884.) Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of *Miranda*. The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purposes of *Miranda*." *Berkemer v. McCarty*, 468 U.S. 420, 438-40 (1984) (footnotes omitted) (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)).

Mr. Adkins did not need "probable cause" to arrest Mr. Adkins for obstructing governmental operations before stopping him from actually completing or repeating the act. If *Terry* applies at all, all that was constitutionally required of the officers before approaching Mr. Adkins was "reasonable suspicion" that Mr. Adkins was "committing, or is about to commit a crime," which here is "obstructing governmental operations." The police were authorized to "detain that person briefly in order to investigate the circumstances that provoke suspicion." *Berkemer*, 468 U.S. 440 (internal quotations omitted). From Mr. Adkins' own pleadings, it is enough to satisfy *Terry* that he was on a narrow single-lane road, that he stopped to take photos from within that road, and that reasonable police officers charged with investigating an accident scene and directing traffic around it might consider his presence to be a "physical interference or obstacle." Mr. Adkins' asserted first amendment rights do not trump the police officers' authority in the circumstances he presents by his complaint and opposition to motion to dismiss.[2]

Mr. Adkins dismisses *Chavez v. City of Oakland*, 2009 WL 1537875 (N.D. Cal. 2009), with facile distinctions and new argument based on "facts" not plead in his complaint that include a link to an online news report, *see* http://www.kuam.com/Global/story.asp?s=11254049&clientype, which contains pictures of the accident uploaded by an online viewer. Mr. Adkins offers the link as evidence that "other members of the general public were allowed access to the accident at Paseo de Oro," *see Opp.*, p. 16. Defendants have no objection to the court considering this "evidence" as an amended factual allegation, because if these "facts" are to be considered,

---

[2] At page 2 of his opposition, Mr. Adkins speculates that "[h]e was also arrested for taking photographs of the automobile accident scene and the Officers took away his cell phone camera, resulting in an unlawful prior restraint of his protected speech." Mr. Adkins' speculation aside, he cannot and does not cite any authority for such an imaginative proposition – that taking photographs of accident scenes from within or on the periphery of the scene itself is "protected speech. For the law is to the contrary. *See Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965) ("The right to speak and publish does not carry with it the unrestrained right to gather information.").

they demonstrate precisely what is wrong with Mr. Adkins' reasoning. The photo from the website referred to in Mr. Adkins' opposition shows a narrow one-lane road. Mr. Adkins' complaint states he was *on that road* when he stopped to take photos with his cell phone. It was on that road, that "a police officer stepped out in front of his car and told plaintiff to stop." *Opp*, p. 3; *see* FAC ¶ 12 ("Plaintiff took out his cell phone with camera and took pictures of the accident while in his car."). The picture below, copied directly from the link provided by Mr. Adkins, show that his comparator from the general public was not *on* the road, but *across* the road, out of the way of traffic. But Mr. Adkins' complaint is that he was *on that road itself* when he was taking pictures and told he could not do that. It defies common sense for Mr. Adkins to assert that reasonable suspicion did not exist to detain him long enough to tell him to stop taking photos from the public road lest he be arrested for "obstructing governmental operations."



Now that Mr. Adkins has supplied visual context to his complaint, it is all the more clear, as a matter of law, that the police were well within their authority, if not duty, to approach and tell

5

Mr. Adkins he was not permitted to take photos from his vehicle on that road, if for no other reason than to get him out of the way of oncoming traffic. Bearing in mind that all that is required under a Terry stop analysis before the officers were authorized to stop Mr. Adkins from engaging in further unlawful conduct is "reasonable suspicion," not "probable cause" that he was "obstructing governmental operations," and bearing in mind that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender," *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001), the police officers were not required to ignore Mr. Adkins or engage in constitutional debate before telling him to stop taking photos and move on.

And that is what distinguishes Mr. Adkins' complaint from the case he relies upon as "[m]ore to the point" at page 16 of his opposition, *Connell v. Town of Hudson*, 733 F.Supp. 465, 470 (D. N.H. 1990) ("The undisputed facts demonstrate that Connell followed all instructions reasonably designed to prevent interference with police and emergency activities. Although he may have crossed a police perimeter, that perimeter was not clearly delineated, and, when asked to move, he moved."); *id*. ("It is hard to imagine how Connell could have interfered with police or emergency activities by taking pictures from the second floor of a house that others were using to view the accident."). Unlike the plaintiff in *Connell*, and unlike the unknown photographer who supplied the online photo reproduced above, Mr. Adkins was not across the street, he was on the very roadway leading to and from the accident. Mr. Adkins does not deny that he was "in very near proximity to the scene of" the crash, on the road itself, when a police officer walked over and told him to stop taking pictures. *See Opp.* Page 4 (acknowledging the defendants' analysis and interpretation of his statement of the facts without contradiction, but

6

arguing that defendants "do not, and cannot, argue that taking pictures of an automobile accident in one's vehicle *on a public road* is a crime") (emphasis added). Unlike the plaintiffs in *Connell*, Mr. Adkins did not stop and move on when asked or ordered to; he insisted on arguing that the law gave him every right to be there.[3]

This case is legally indistinguishable from *Chavez*, except that the plaintiff there had exited his vehicle to walk into traffic on the interstate to take video whereas Mr. Adkins says he stayed in his car *on the road itself* in order to take snapshots with his cell phone.

> After plaintiff had been at the scene for approximately 15 minutes, he observed Officer Reynolds of the Oakland Police Department. A few minutes later Reynolds approached plaintiff and asked if he had witnessed the incident. Plaintiff responded no, and advised that he was with the press. Reynolds asked plaintiff where he had parked his car. Plaintiff identified his car in lane 1 and Reynolds directed plaintiff to go to his car and leave. Plaintiff responded that as a member of the media he had a right to cover accident scenes. Reynolds retorted that "he didn't care, that [plaintiff] had to go back to [his] car and leave because [he] didn't 'need to take these kind of pictures.' " Plaintiff repeated that as a member of the media he had the right to be there. Reynolds again stated that it was a crime scene and instructed plaintiff to return to his car and leave. Plaintiff said okay and started walking to his car. This entire conversation lasted a minute or two.
>
> As plaintiff was walking to his car he heard an ambulance at the scene behind him, traveling the southbound lanes of 880, on the other side of the median, and he turned to look. Reynolds approached and told plaintiff he was going to issue plaintiff a citation; he grabbed plaintiff's press credential, and demanded his driver's license and proof of insurance, as well as vehicle registration.
>
> Plaintiff started walking toward his car to retrieve his registration when he heard the first California Highway Patrol ("CHP") car arrive at the scene. This was approximately 30 minutes after the accident. The CHP car was approaching on southbound 880 with its lights flashing, on the other side of the median. Plaintiff believed the late arrival of the CHP was newsworthy and therefore raised his camera to take a picture of the arriving CHP car, while he continued to walk.

---

[3] At page 11 of his opposition, Mr. Adkins takes issue with the defendants' characterization of his colloquy with the police and whether or not he was "arguing," but rather "merely stating his understanding of the law." However he characterizes it, Mr. Adkins certainly was not agreeing with the officers, nor complying with their directives. Else, he'd have put his cell phone away and driven on.

7

> Reynolds immediately stood in front of plaintiff, grabbed his camera, and said: "that's it, you're under arrest, you don't need to take these kinds of pictures." Reynolds and Officer Garcia then handcuffed plaintiff and forced him to sit on the highway near the overturned car for approximately 30 minutes. When they finally released plaintiff from the handcuffs, Reynolds warned plaintiff not to ever come there again and take those kind of pictures.

*Chavez*, at \*1 (editorial brackets in original). There is no functional difference between the facts in *Chavez* and those alleged by Mr. Adkins, not when it comes to the question whether it was clearly established that police officers could or could not order members of the public off the streets and away from accident scenes when road conditions as shown in Mr. Adkins' opposition supplementing his complaint make it obvious that the middle of a public road is no place to stop and take photographs for posterity. On June 2, 2009, barely four months before Mr. Adkins was arrested, United States District Judge Charles R. Breyer, of the Northern District of California held, "The law was also not clearly established that an officer could not arrest someone for refusing to comply with an order from the officer when, rather than immediately complying, the person asserts that he has the right to stand in the freeway and take photographs." *Chavez*, at \*6. That is exactly Mr. Adkins' claim – that he had a right to stay and take pictures. If the law was not clearly established in California in June that the press is not permitted to stand in traffic on a freeway to take photos, neither was it clearly established in October, on Guam or in any other court in the Ninth Circuit, that Mr. Adkins's constitutional right to free speech authorized him to photograph accidents from his vehicle, in the middle of the road, after being ordered not to by police at the scene. How different the arguments in this case would be if Mr. Adkins was alleging he was trying to comply with the orders of police when he was arrested. But he is not.

What happened then escalated from an ordinary traffic stop to a situation where the police were lawfully authorized to order Mr. Adkins out of his car before continuing their

8

constitutional debate. The law is not clearly established that it was unconstitutional for police to instruct him to step out of the car, particularly inasmuch as he made it plain he was not going to comply unless arrested, and especially when the law is well-settled that "[a] law enforcement officer may order the driver out of a vehicle during a lawful traffic stop." *Lawyer v. City of Council Bluffs*, 361 F.3d at 1105 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977)). Mr. Adkins' speculation at page 8 that "the Officers' order to get out of the car and Mr. Akins' [sic] subsequent arrest were due in part to his comments about his understanding of the law, in violation of the First Amendment," is immaterial. Having decided to engage the police officers "about his understanding of the law," Mr. Adkins was not authorized to ignore the officers' directive to exit his vehicle before continuing the argument. The law is clear enough about that.

"Police officers are not expected to parse code language as though they were participating in a law school seminar…." *Lawyer v. City of Council Bluffs*, 361 F.3d at 1108. "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). Just as "common sense dictates that members of the general public are not allowed to exit their cars in the middle of the freeway to view an accident scene," *Chavez*, * 3, so too, common sense dictates that the public is not permitted to stop on a single-lane road to take photographs and then argue about it when they are told they cannot by the police officers who are responsible for that accident scene and the traffic around it.

## CONCLUSION

"Our task is to determine whether the preexisting law provided the defendants with 'fair warning' that their conduct was unlawful." *Flores v. Morgan Hill Unified Sch. Dist.,* 324 F.3d

9

1130, 1136-37 (9th Cir. 2003) (citing *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)). Mr. Adkins cannot demonstrate that preexisting law provided fair warning to police that approaching him with reasonable suspicion that he was obstructing governmental operations and directing him to stop taking photos and to move away from the scene of an accident was unlawful. Mr. Adkins' own filings demonstrate he was on a narrow single-lane road leading to and from an accident scene still being investigated when ordered to stop and move on. The conclusion that he was being ordered to move away from the scene is proved by his insistence that he had every right to stay and photograph it, whether he considers that arguing or "merely stating his understanding of the law." Mr. Adkins' own pleadings demonstrate there was more than enough "reasonable suspicion" that he was in the process of "obstructing governmental operations," by blocking a public roadway and which justified the police instructing him to move away from the scene of an accident. His refusal to exit his vehicle before continuing his argument with police over his constitutional "rights" to take pictures provided more than probable cause to arrest him for "failure to comply." Because the law was not clearly established that their actions were unconstitutional, Officers Anciano and Artui are immune.

Defendants Serafino Artui and D.B. Anciano respectfully move the court for an order of dismissal of all claims for damages against them, with prejudice. As a matter of law, defendants are entitled to qualified immunity from plaintiff's constitutional claims, and statutory immunity as to all claims based upon local law.

/s/     James T. Mitchell
JAMES T. MITCHELL
 Attorney for defendants Artui and Anciano

10

Case 1:09-cv-00029    Document 49    Filed 02/02/2010    Page 10 of 11

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the forgoing on all counsel by hand delivery, or electronically with the Clerk of Court using the CM/ECF System, or via first class mail, postage prepaid and properly addressed to the following:

| | |
|---|---|
| Anita P. Arriola, Esq., <br> Arriola, Cowan & Arriola <br> 259 Martyr Street, Suite 201 <br> P.O. Box X, <br> Hagåtña, Guam 96910 <br> Email: acalaw@teleguam.net | J. Patrick Mason <br> Deputy Attorney General <br> 287 West O'Brien Drive <br> Hagåtña, Guam 96910 <br> pmason@guamattorneygeneral.com |

this 2nd day of February, 2010.

/s/ James T. Mitchell
JAMES T. MITCHELL