# IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| **JAMES L. ADKINS**, <br> Plaintiff, <br> v. <br> **PAUL SUBA** *et al.*, <br> Defendants. | Case Number: 1:09-cv-00029 <br><br> **OPINION AND ORDER RE: MOTION TO DISMISS SECOND AMENDED COMPLAINT FILED BY DEFENDANT SUBA** |

Before the court in this wrongful-arrest-and-detention case is the "Motion to Dismiss Second Amended Complaint" ("the Motion") filed by Defendant PAUL SUBA. *See* Docket No. 115. As explained below, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

## (I)  BACKGROUND[1]

### (A)  Plaintiff's Arrest and Detention

On October 4, 2009, Plaintiff JAMES L. ADKINS ("Plaintiff") was driving down Paseo de Oro in Tamuning. *See* Docket No. 103 at ¶12. Rounding a curve he saw, on his left, a truck that had crashed into a wall. *Id*. On his right, he saw some Guam Police Department ("GPD") personnel standing in the shade of a house across the street from the crash site. *Id*. There were no police officers on the left, near the crash site, nor were there any obstacles preventing persons from approaching the crash site, such as "crime scene tape" or a roadblock. *Id*. Plaintiff pulled over to the right-hand side of the road and, without leaving his car, took photos of the crash site using the camera feature of his cell phone. *Id*.

---

[1] On a motion to dismiss, the court takes "all well-pleaded factual allegations as true." *Hebbe v. Pliler*, 627 F.3d 338, 341-42 (9th Cir. 2010). For its statement of facts, then, the court relies entirely on the Second Amended Complaint.

Page 1 of 16

"As [P]laintiff was driving away," a GPD officer stepped out in front of his car and told him to stop. Docket No. 104 at ¶13. When Plaintiff stopped his car, the officer ("Officer One") told him that he could not take pictures. *Id.* Plaintiff said something like: "There is nothing wrong with taking pictures." *Id.* Officer One spoke with a second police officer ("Officer Two") who was present, and then demanded that the Plaintiff give him the cell phone. *Id.* Plaintiff refused. *Id.* Officer One again demanded the cell phone, and Plaintiff again refused. *Id.*

Plaintiff believes that Defendants Anciano and Artui are Officers One and Two, but he is not sure which was which. See Docket No. 103 at ¶¶13, 14.

Officer Two then approached Plaintiff's car and also demanded the cell phone. See Docket No. 103 at ¶14. Plaintiff said something like: "There's no law against taking pictures." *Id*. Officer Two again demanded the cell phone, and Plaintiff again refused. *Id*. Officer Two then ordered the Plaintiff out of his car. *Id*. Plaintiff said something like: "The only way I will get out is if I am under arrest." *Id*. Officer Two then told Plaintiff that he was under arrest, whereupon Plaintiff got out of his car. *Id*.

One of the GPD officers handcuffed Plaintiff and put him in a police car. *See* Docket No. 103 at ¶16. While in the police car, Plaintiff retrieved his cell phone and called his wife to tell her he had been arrested and to ask her to call his attorney. *Id*. At that point, either Officer One or Officer Two grabbed Plaintiff's cell phone and took it away. *Id*.

Plaintiff was driven to the Tumon police station, where he was incarcerated. *See* Docket No. 103 at ¶17. When Plaintiff's lawyer, Donald Calvo, arrived, a police sergeant demanded that Mr. Calvo delete the photos stored on Plaintiff's cell phone. *Id*. Mr. Calvo refused. *Id*. Plaintiff was then brought to a conference room, where a police sergeant informed Plaintiff that the accident had been a serious one, and that the photo-taking incident was also serious and that they were trying to figure out how to handle the case. *Id*. The police sergeant then held out Plaintiff's cell phone and demanded that he delete the pictures from it. *Id*. This led Plaintiff to believe that the "deal on the table" was that he could go free if he deleted the pictures. *Id*. Plaintiff refused. *Id*.

A little while later, another police officer took Plaintiff to the Hagåtña police station where he was booked, fingerprinted, and photographed. *See* Docket No. 103 at ¶18. Plaintiff was restrained and detained from about 4:30 PM to 8:30 PM. *Id*.

After his release, Plaintiff was given a notice to appear, which instructed him to appear in court on September 29, 2010. *See* Docket No. 103 at ¶20. In the notice to appear, Plaintiff learned that he was charged with (1) "obstructing governmental function," based on Section 55.45 of Title 9, Guam Code Annotated ("the Obstruction Statute"), and (2) "failure to comply," based on Section 3503(d) of Title 16, Guam Code Annotated ("the Compliance Statute"). *Id*. at ¶¶1, 20.

### (B) The "Prosecution Decline" Memorandum

The day after Plaintiff's arrest and detention—that is, on October 5, 2009—the Office of the Attorney General ("OAG") issued a "Prosecution Decline Memorandum" ("the Memorandum"), in which it explained that it would not prosecute Plaintiff on the charge for which he was arrested. *See* Docket No. 103 at ¶25; *see also id*., Exh. E (the Memorandum). The Memorandum was addressed to the "GPD Records Division." *Id*., Exh. E. It identified the potential charge as "Obstructing Government Functions," and stated that "[t]he arrest and detention of the suspect(s) served as sufficient sanctions in this case, as the seriousness of the offense [did] not warrant further legal action." *Id*., Exh. E.

### (C) The Public's Access to the Accident Scene

Plaintiff asserts that members of the general public were not excluded from the accident scene, nor from the road Plaintiff had been driving on. *See* Docket No. 103 at ¶15. Other vehicles were traveling in both directions along Carmen Memorial Drive. *Id*. Plaintiff also asserts that at least one other member of the general public had access to the accident scene, insofar as an anonymous "online viewer" posted two digital photographs of the accident scene on the website of local news station KUAM on October 4, 2009—the date of the accident and of Plaintiff's arrest and detention. *Id*. Plaintiff asserts, "[u]pon information and belief," that this "online viewer" was not stopped, detained, or arrested for taking photographs of the accident, nor did GPD officers seize his or her camera. *Id*.

### **(D)** **Plaintiff's Cell Phone**

At the Tumon police station, on the day of his arrest, Plaintiff signed the plastic "custody bag" in which GPD was to keep his phone. *See* Docket No. 103 at ¶19. In affixing his signature to the custody bag, Plaintiff had two witnesses: (1) his wife, and (2) a police officer who showed Plaintiff his cell phone. *Id*.

On March 10, 2010, Plaintiff went to the GPD Property Section at Tiyan to get his cell phone. *See* Docket No. 103 at ¶23. Defendant JOHN F. TAITANO returned the phone, along with a "GPD Evidence/Property Custody Receipt." *Id*. However, Plaintiff noticed that the custody bag was not the same one he had signed on October 4, 2009: his signature was missing. *Id*. Plaintiff told Defendant Taitano that the custody bag was different. *Id*.

Plaintiff also found that his cell phone would not turn on. *See* Docket No. 103 at ¶26. He sent the phone to Independent Technology Service, Inc. ("ITS"), a company specializing in data recovery. *Id*. ITS determined that the data on Plaintiff's cell phone were not recoverable, because (1) the phone had been exposed to water, (2) the phone had been completely erased, and/or (3) the digital memory card had been "blown" and rendered useless, perhaps by the application of electric current. *Id*. During the time that the cell phone was in Plaintiff's possession, it was not immersed in or exposed to any water, nor had it been erased, nor had electric current been applied to it. *Id*. at ¶28.

Studying the "GPD Evidence/Property Custody Receipt," Plaintiff saw that his cell phone was logged on the day of his arrest—October 4, 2009—at 4:48 PM by Defendant Artui. *See* Docket No. 103 at ¶24; *see also id*., Exh. D (copy of the evidence/property custody receipt). The next entry shows that the cell phone was logged in at 12:04 AM on October 4 [*sic*], 2009, again by Defendant Artui. *Id*. at ¶24. On October 5, 2009, the cell phone was logged in to an "evidence box," and later that same day was logged in to the "vault/bin." *Id*. Nothing further occurred until December 7, 2009—four days after this lawsuit was filed—when Defendant Taitano signed out the cell phone, at 3:05 PM, for "retrieval of evidence." *Id*. Defendant J. P. RODRIGUEZ also signed out the cell phone that same day, at 3:15 PM, for "evidence analysis." *Id*.

**(E)    Plaintiff's Subsequent Research**

Around January 26, 2010, Plaintiff put in an official request to GPD for "information concerning, *inter alia*, the training and supervision provided to police officers regarding vehicle stops, arrests, seizure of personal property; the detention, interrogation, or arrest of individuals exercising their right of free speech; and preventing police officers from using arrest and seizure of property as a form of summary punishment and to discipline officers who do so or who condone such conduct." Docket No. 103 at ¶30. GPD's responses showed that the General Orders regarding various police activities (*e.g.*, field contact, handling and processing of persons in custody, handling of evidence and property, *etc.*) had not been updated in fifteen or more years. *See id*. at ¶31. GPD's responses included no General Orders concerning supervisory review of arrests, protection of individuals' constitutional rights, or the use of arrest and seizure as a form of summary discipline. *See id*.

In related research, Plaintiff also discovered that Defendant Anciano had been the arresting officer in *People v. Maysho*, where the Superior Court of Guam dismissed after trial a charge under the Compliance Statute. *See* Docket No. 103 at ¶34 (citing *People v. Maysho*, 2005 Guam 4).

Finally, at all times relevant, Defendant PAUL SUBA was the Chief of GPD. *See* Docket No. 103 at ¶6.

**(II)    PROCEDURAL HISTORY**

This case began on December 3, 2009, when Plaintiff filed his original complaint. *See* Docket No. 1. Plaintiff filed his First Amended Complaint ("FAC") on December 9, 2009. *See* Docket No. 9. On the basis of several challenges mounted by Defendants, the court dismissed parts of the FAC on August 24, 2010. *See* Docket No. 78.[2]

Plaintiff filed his Second Amended Complaint ("SAC") on November 24, 2011. *See* Docket No. 103. There are nine causes of action: (I) Violation of Civil Rights, per 42 U.S.C. § 1983, against Defendants Suba, Anciano, and Artui; (II) "Violation of Due Process of

---

[2] The reasoning underlying this dismissal is relevant to the instant Motion, so the court discusses it further below, in the "DISCUSSION" section.

1 Law," against all Defendants; (III) "Violation of Free Speech," against all Defendants; (IV) "Violation of Right to Privacy and Unlawful Seizure," against all Defendants; (V) False Arrest and False Imprisonment, against Defendants Anciano and Artui; (VI) Assault and Battery, against Defendants Anciano and Artui; (VII) Violation of 10 G.C.A. § 77177 and Negligence, against Defendants Anciano, Artui, Taitano, and Rodriguez; (VIII) Theft of Property and Conversion, against Defendants Anciano, Artui, Taitano, Rodriguez, and Suba; and (IX) "Punitive Damages," against Defendants Anciano, Artui, Taitano, Rodriguez, and Suba. *See* Docket No. 103 at ¶¶39-87.

Defendant Suba moved to dismiss the SAC on January 7, 2011. *See* Docket No. 115 ("the Motion"). Plaintiff opposed the Motion on February 4, 2011. *See* Docket No. 140 ("the Opposition"). Defendant Suba replied to the Opposition on February 18, 2011. *See* Docket No. 144 ("the Reply"). Finally, the court heard oral argument on the Motion on September 13, 2011. *See* Docket No. 161.

### (III) JURISDICTION AND VENUE

Jurisdiction is proper. Counts One through Four are within the court's federal question jurisdiction; all others are within the court's supplemental jurisdiction. *See* 28 U.S.C. §§ 1331, 1367(a). Venue is proper here, in the District of Guam, because all of the events or omissions complained of occurred here. *See* 28 U.S.C. § 1391(b)(2).

### (IV) APPLICABLE STANDARDS

A pleading that states a claim for relief must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rule 12(b)(6) of the Federal Rules of Civil Procedure enables a defendant to raise by motion the defense that the complaint "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).

"[A] complaint may survive a [Rule 12(b)(6)] motion to dismiss only if, taking all well-pleaded factual allegations as true, it contains enough facts to 'state a claim to relief that is plausible on its face.'" *Hebbe v. Pliler*, 627 F.3d 338, 341-42 (9th Cir. 2010) (quoting *Ashcroft v. Iqbal,* 556 U.S. ___, 129 S. Ct. 1937, 1949 (2009)).

Underlying that rule are two basic principles. "First, allegations in a complaint or counterclaim must be sufficiently detailed to give fair notice to the opposing party of the nature of the claim so that the party may effectively defend against it." *Starr v. Baca*, 633 F.3d 1191, 1204 (9th Cir. 2011). "Second, the allegations must be sufficiently plausible that it is not unfair to require the opposing party to be subjected to the expense of discovery." *Id.*

As for the meaning of the term "plausible," "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.

This standard

> . . . is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of "entitlement to relief."

*Iqbal,* 129 S. Ct. at 1949. Application of this standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950. And this standard applies to "all civil actions"—"antitrust and discrimination suits alike." *Id.* at 1953.

**(V)** **DISCUSSION**

Defendant Suba is named in Counts I, II, III, IV, VIII, and IX of the SAC. He argues that each count should be dismissed under Rule 12(b)(6).

Plaintiff's federal claims against Defendant Suba proceed on a theory of "supervisory liability" under Section 1983. "Supervisory liability is imposed against a supervisory official in his individual capacity [1] for his own culpable action or inaction in the training, supervision, or control of his subordinates, [2] for his acquiescence in the constitutional deprivations of which the complaint is made, or [3] for conduct that showed a reckless or callous indifference to the rights of others." *Menotti v. City of Seattle*, 409 F.3d 1113, 1149 (9th Cir. 2005) (numbering added). *See also Starr*, 633 F.3d at 1197 (same formulation of elements).

There is an important qualification. In *Ashcroft v. Iqbal*, the Supreme Court called supervisory liability "a misnomer," because "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, 129 S. Ct. at 1948-49.[3] Since "each Government official . . . is only liable for his or her own misconduct," the Court went on to hold that, where the constitutional tort at issue requires a specific mind-state (*e.g.*, discriminatory purpose), supervisory liability for that tort is adequately alleged only if the complaint contains facts allowing the court to reasonably infer that the supervisor committed the allegedly tortious acts *with that specific mind-state*. *Id*. at 1948-52; *see Starr*, 633 F.3d at 1196 (where claim requires "deliberate indifference" mind-state, as in Eighth Amendment claim, "[a] showing that a supervisor acted, or failed to act, in a manner that was deliberately indifferent to an inmate's Eighth Amendment rights is sufficient to demonstrate the involvement—and the liability—of that supervisor."). *See also* 1 SHELDON NAHMOD, CIVIL RIGHTS & CIVIL LIBERTIES LITIGATION: THE LAW OF SECTION 1983 §1:43 (2010) ("Further, *Iqbal* significantly changed the approach in the circuits to supervisory liability by simply asserting—without much explanation beyond rejecting *respondeat superior* liability—that individuals sued for their conduct or failures to act where their subordinates violated constitutional rights must themselves personally have the requisite state of mind required for the particular constitutional violations.")

The FAC had some claims against Defendant Suba quite like the ones now before the court in the SAC. Specifically, the FAC named Defendant Suba in Counts I, II, III, IV, and IX, which are essentially identical to the same-numbered ones in the SAC. *Compare* Docket No. 103 *with* Docket No. 9. The only difference is that Defendant Suba is named in Count VIII of the SAC, whereas he was not so named in the FAC. *See* Docket No. 103 at ¶¶82-85.

When Defendant Suba moved to dismiss those original FAC counts, the court sustained his challenge and dismissed all counts naming him. *See* Docket No. 78 at 19:8-12; 19:25-20:5. "Qualified immunity shields federal and state officials from money damages

---

[3] Misnomer or not, "supervisory liability" is still a meaningful phrase in current use, so the court will keep to it. *See*, *e.g.*, *Starr*, 633 F.3d at 1193-97 (using the term many times).

unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. \_\_\_, 131 S. Ct. 2074, 2080 (2011). The court dismissed all FAC counts naming Defendant Suba because it agreed with the Magistrate Judge that Plaintiff had failed to "allege sufficient non-conclusory facts which could state a plausible claim for [S]ection 1983 supervisory liability." Docket No. 63 at 21:9-10. *See generally id*. at 17:5-22:25.

In deciding this Motion, then, the essential question is whether, in moving from the FAC to the SAC, Plaintiff has added enough factual matter to state supervisory liability and common-law tort claims against Defendant Suba, in a manner that evades any qualified immunity issues.

### (A) Count I

Count I contends that, in taking all the actions described above, Defendant Suba deprived Plaintiff of rights secured to him by the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution, and that he has a remedy against them for these deprivations under Section 1983 of Title 42, United States Code. *See* Docket No. 103 at ¶¶39-45.

The court will dismiss this count **WITHOUT LEAVE TO AMEND** for the same reasons specified in the relevant part of its order on the Anciano-Artui Motion to Dismiss (*see* Docket No. 163 at 9)—essentially, because it is redundant in light of Counts II, III, and IV, and there is no change that Plaintiff could make to Count I to make it non-redundant.

### (B) Count II

Count II contends that the Obstruction Statute and the Compliance Statute are void for vagueness. *See* Docket No. 103 at ¶¶46-49. This count bears three readings. On one reading, it asks the court to declare the statutes unconstitutional under the void-for-vagueness doctrine. On another reading, it asks the court to hold Defendant Suba liable to Plaintiff for damages under Section 1983 because he violated Plaintiff's due process rights when he permitted him to be seized on such vague statutes. On a third reading, it asks the court to

hold Defendant Suba liable to Plaintiff for damages under Section 1983 because he violated Plaintiff's due process rights when he permitted Plaintiff's cell phone to be seized, and ultimately destroyed, without legal reason.

The court will dismiss this count **WITHOUT LEAVE TO AMEND** for the same reasons specified in the relevant part of its order on the Anciano-Artui Motion to Dismiss (*see* Docket No. 163 at 9-11)—essentially, because (1) Plaintiff cannot show that he has standing to seek declaratory relief, (2) as a matter of law he must challenge his arrest and detention on Fourth Amendment grounds, not generalized due process grounds, and (3) his allegations of random and unauthorized deprivation of property cannot state a Section 1983 due process claim.

### (C) Count III

Count III contends that Defendant Suba is liable to Plaintiff under Section 1983 because, in taking all the actions described above, he deprived Plaintiff of his right to freedom of speech, as secured by the First Amendment. *See* Docket No. 103 at ¶¶50-57.

As stated above, where the constitutional tort at issue requires a specific mind-state, supervisory liability for that tort is adequately alleged only if the complaint contains facts allowing the court to reasonably infer that the supervisor committed the allegedly tortious acts *with that specific mind-state*. *See Iqbal*, 129 S. Ct. at 1948-52; *Starr*, 633 F.3d at 1196.

In a Section 1983 case alleging deprivation of First Amendment rights, "the defendant's motive is relevant, and [the] plaintiff's burden of proof is similar to that set out in cases where an employer's adverse employment action is alleged to be due to plaintiff's First Amendment activities." *Sloman v. Tadlock*, 21 F.3d 1462, 1469 n.10 (9th Cir. 1994) (citing, *inter alia*, *McKinley v. City of Eloy*, 705 F.2d 1110 (9th Cir. 1983)). This is true even when the claim is that "[the defendant] used his official powers . . . to deter [the plaintiff's] exercise of [First Amendment] rights in the future"—*i.e.*, even when the claim is of prior restraint. *Id.* at 1469. *Cf. Madison Joint Sch. Dist. No. 8 v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 177 (1976) (conduct "designed to govern speech and conduct in the future" as "the essence of prior restraint").

Thus, in any Section 1983 First Amendment case, a plaintiff must allege not only that "[the defendant] deterred or chilled [the plaintiff's] political speech," but also that "such deterrence was a substantial or motivating factor in [the defendant's] conduct[.]." *Id*. *See also Mendocino Env. Ctr. v. Mendocino County*, 14 F.3d 457, 464 (9th Cir. 1994) ("The defendant's intent *is* an element of the [First Amendment] claim.") (emphasis in original).

The SAC contains no facts that would allow the court to reasonably infer that Defendant Suba took any actions with the deterrence of free speech as "a substantial or motivating factor." The SAC does not even allege as much. The court will therefore dismiss this count **WITH LEAVE TO AMEND**.

### (D)  Count IV

Count IV contends that Defendant Suba is liable to Plaintiff under Section 1983 because, in taking all the actions described above, Defendant Suba deprived Plaintiff of his Fourth-Amendment right to be secure in his person and effects against unreasonable searches and seizures. *See* Docket No. 103 at ¶¶58-60. This claim has two aspects: (1) the unreasonable seizure of Plaintiff's person, and (2) the unreasonable seizure of his cell phone.

Again, "[s]upervisory liability is imposed against a supervisory official in his individual capacity [1] for his own culpable action or inaction in the training, supervision, or control of his subordinates, [2] for his acquiescence in the constitutional deprivations of which the complaint is made, or [3] for conduct that showed a reckless or callous indifference to the rights of others." *Menotti v*, 409 F.3d at 1149.

#### (1)  Culpable action or inaction in training

Plaintiff first suggests that Defendant Suba is liable for culpable action or inaction in the training of his subordinates. *See* Docket No. 103 at ¶¶29-38.

"[T]he inadequacy of police training may serve as the basis for [Section] 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). *See also*, *e.g.*, *Canell v. Lightner*, 143 F.3d 1210, 1213 (9th Cir. 1998) (to establish supervisory liability on failure-to-train theory, a plaintiff must show that the failure

"amounted to deliberate indifference"); *McGrath v. Scott*, 250 F. Supp. 2d 1218, 1224 (D. Ariz. 2003) ("Therefore, the relevant inquiry in the Ninth Circuit is whether the supervisor appeared 'deliberately indifferent' in supervising subordinates, and, if so, whether that deliberate indifference actually caused the deprivation of the plaintiffs federal rights."). This makes sense, in order to keep supervisory liability from being reduced to *respondeat superior* liability.

"Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood." *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001). An aspect of that knowledge component is that deliberate indifference requires "some form of notice." *City of Canton*, 489 U.S. at 395.

In connection with this failure-to-train theory, Plaintiff has two factual allegations. First, the General Orders regarding various police activities (*e.g.*, field contact, handling and processing of persons in custody, handling of evidence and property, *etc.*) had not been updated in fifteen or more years, and there do not seem to be any General Orders concerning supervisory review of arrests, protection of individuals' constitutional rights, or the use of arrest and seizure as a form of summary discipline. *See id.* at ¶31. Second, Defendant Anciano had been the arresting officer in *People v. Maysho*, where the Superior Court of Guam dismissed after trial a charge under the Compliance Statute. *See id.* at ¶34 (citing *People v. Maysho*, 2005 Guam 4).

These factual allegations do not support supervisory liability on a failure-to-train/failure-to-supervise theory, because they do not allow the court to draw the reasonable inference that Defendant Suba was on notice of, or deliberately indifferent to, anything. *See Iqbal,* 129 S. Ct. at 1949. The bare fact that the General Orders have not been amended is "merely consistent" with liability, rather than suggestive of anything. *Iqbal,* 129 S. Ct. at 1949. For example, it could very well be that the extant General Orders are legally sufficient but ignored, in which case their non-amendment would not be probative of any relevant fact. At any rate, nothing in the case-law suggests that it is clearly established that a police chief's failure to amend General Orders is *per se* constitutionally tortious conduct.

Likewise, *Maysho* does not support supervisory liability on a failure-to-train/failure-to-supervise theory. For our purposes here, all that *Maysho* says is that the trial court dismissed a charge under the Compliance Statute after trial. *See Maysho*, 2005 Guam 4, at ¶3. That is all. It would be one thing if the Superior Court in *Maysho* had dismissed the charge under the Compliance Statute, the Office of the Attorney General had appealed that dismissal, and the Supreme Court had affirmed, with some kind of discussion of the frivolity of the charge and some findings suggesting that it was part of a pattern or practice. But *Maysho* contains nothing like that. It simply says, again, that the charge under the Compliance Statute was dismissed after trial. *Maysho* therefore cannot have put Defendant Suba on notice of any kind of problem, let alone that "harm to a federally protected right [was] substantially likely," and so has no relevance here.

Thus, Count IV fails to state a claim against Defendant Suba, insofar as it proceeds on a theory that he is liable for culpable action or inaction in the training of his subordinates.

### **(2)** **Acquiescence in the constitutional deprivations**

Plaintiff also suggests that Defendant Suba is liable for his acquiescence in the constitutional deprivations of which the complaint is made. *See* Docket No. 103 at ¶¶25, 35.

Legally, "acquiescence" means "tacit or passive acceptance; implied consent to an act." BLACK'S LAW DICTIONARY (9th ed. 2009); *see also Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1059 n.5 (9th Cir. 2006) (same, using Black's). The use of the terms "acceptance" and "consent" suggest that a person must have some kind of knowledge of an event before he or she can acquiesce in it. *Cf. United States v. Launder*, 743 F.2d 686, 689 (9th Cir. 1984) (verb "to suffer," considered as a synonym of "to acquiesce," "implies knowledge"). Thus, Defendant Suba cannot have "acquiesced" in any constitutional deprivations without knowing of them.

Plaintiff does not allege, and the SAC asserts nothing to suggest, that Defendant Suba knew of the seizure of his person. However, it does state facts going to Defendant Suba's knowledge of the seizure of Plaintiff's cell phone.

Those facts arise in connection with the Memorandum. The Memorandum was issued by the Office of the Attorney General to GPD the day after Plaintiff's arrest.[4] *See* Docket No. 103, Exh. E. It is clearly addressed to the "GPD Records Division." *See id*. It clearly states that there would be no prosecution of Plaintiff, and that there was no reason to retain Plaintiff's property. As the head of GPD, Defendant Suba knew, or certainly should have known, of the Memorandum and its contents.

A seizure for Fourth Amendment purposes may occur when there is some meaningful interference with an individual's possessory interest in property. *See*, *e.g.*, *Soldal v. Cook County, Ill*., 506 U.S. 56, 63 (1992). The destruction of property is "meaningful interference" constituting a seizure under the Fourth Amendment. *See*, *e.g.*, *United States v. Jacobsen*, 466 U.S. 109, 124-25 (1984).

Here, GPD appears to have seized Plaintiff's cell phone, to have retained it about five months for no discernible reason, and ultimately to have returned it to Plaintiff in "useless," "destroyed" condition. Docket No. 103 at ¶¶26, 27. Plaintiff asserts that Defendant Suba had knowledge of GPD's illegal possession of Plaintiff's cell phone one day after it was seized, and the Memorandum's date and address lines make this assertion of knowledge plausible. Insofar as Defendant Suba had this knowledge, he acquiesced in at least one of the constitutional deprivations of which the complaint is made—namely, the unreasonable seizure of Plaintiff's personal property in violation of the Fourth Amendment.

Thus, Count IV does state a claim against Defendant Suba, insofar as it proceeds on a supervisory liability theory that he is liable for his acquiescence in the constitutional deprivations of which the complaint is made. *See* Docket No. 103 at ¶¶25, 35. Count IV therefore states a claim under Section 1983 for deprivation of Plaintiff's Fourth-Amendment right to be secure in his person and effects against unreasonable searches and seizures.

---

[4] Defendant Suba states that the Memorandum "was not officially communicated" to GPD until January 27, 2010, nearly two months after Plaintiff brought this lawsuit. *See* Docket No. 144 at 3-4 n. 4. This could be true, and may affect the case later. However, the SAC states, and the Memorandum facially suggests, that GPD was notified of the decision not to prosecute on October 5, 2009. At this point in the proceedings, the court has to take Plaintiff's allegations as true. *See Hebbe*, 627 F.3d at 341-42.

1  Consequently, there is no need to consider the final possible theory of supervisory liability,
2  the showing of reckless or callous indifference, and the Motion is **DENIED** as to this count.

**(E)** <u>**Count VIII**</u>

Count VIII contends that Defendant Suba "committed theft of property by failing to return plaintiff's cell phone camera after being notified that plaintiff would not be prosecuted." Docket No. 103 at ¶83.

At the outset, the court **STRIKES** the reference to "theft of property" and construes this claim as one for conversion, because Guam does not recognize a cause of action for civil theft. *See* 9 G.C.A. § 43.15 (there is a "single offense" of theft, which is criminal in nature).

The elements of conversion are: "(1) facts showing plaintiff's ownership or right to possession of property; (2) defendant's wrongful act toward, or disposition of, the property, interfering with plaintiff's possession; and (3) damage to plaintiff." *Marianas Hospitality Corp. v. Premier Business Sol'ns, Inc.*, No. 1:07-cv-00002, 2009 WL 750247, at *10 (D. Guam Jan. 14, 2009).

Here, Plaintiff has properly alleged facts to state a conversion claim. It is easy to see that elements (1) and (3) are properly alleged, as nobody would dispute Plaintiff's ownership of his cell phone, and Plaintiff has clearly stated that his cell phone was returned to him in "useless," "destroyed" condition. Docket No. 103 at ¶¶26, 27. As for element (2), if the discussion of Count IV is correct, then Plaintiff has adequately alleged that Defendant Suba violated the Constitution by acquiescing in the unreasonable seizure of Plaintiff's personal property. Unconstitutionally unreasonable conduct is wrongful conduct. *See Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (*en banc*) (foundation of supervisory liability is "supervisor's *wrongful* conduct") (emphasis added).[5] Thus, Plaintiff

---

[5] This would suggest that whenever a plaintiff has (1) a viable Section 1983 claim based on an unreasonable seizure of property in violation of the Fourth Amendment, that plaintiff will also tend to have (2) a viable conversion claim against the persons involved. Cases bear this out. *See, e.g.*, *Giron v. City of Alexander, Arkansas*, No. 4:07-CV-00568 GTE, 2009 WL 2998946, at *23 (E.D. Ark. Sept. 11, 2009); *Kincaid v. City of Fresno*, No. CV-F-06-1445 OWW, 2008 WL 2038390, at *4, 18 (E.D. Cal. May 12, 2008); *Dawson v. City of Montgomery*, No. 2:06-cv-1057-WKW, 2008 WL 659800, at *9 (M.D. Ala. Mar. 6, 2008); *Dockery v. Tucker*, No. 97-CV-3584 (ARR), 2006 WL 5893295, at *25 (E.D.N.Y. Sept. 6, 2006).

1 has adequately alleged that Defendant Suba engaged in a "wrongful act toward, or
2 disposition of, the property, [which] interfer[ed] with [P]laintiff's possession" of the cell
3 phone.
4     It follows that Count VIII adequately alleges a conversion claim, so the Motion is
5 **DENIED** as to this count.
6     **(F)**     <u>**Count IX**</u>
7     Count IX simply contends that Plaintiff is entitled to punitive damages. *See* Docket
8 No. 103 at ¶¶86-87. The court will dismiss this count **WITHOUT LEAVE TO AMEND**
9 for the same reasons specified in the relevant part of its order on the Anciano-Artui Motion
10 to Dismiss (*see* Docket No. 163 at 16-17)—essentially, because Count IX simply is not a
11 cause of action.
12 **(VI)**     <u>**CONCLUSION**</u>
13     For the reasons stated above, the court hereby **GRANTS** the Motion as to **Counts I,**
14 **II, and IX**, and **DISMISSES** those counts **WITHOUT LEAVE TO AMEND**. The court
15 also hereby **GRANTS** the Motion as to **Count III**, but dismisses that count **WITH LEAVE**
16 **TO AMEND**. Finally, the court hereby **DENIES** the Motion as to **Counts IV** and **VIII**,
17 except that the reference to "Theft of Property" in **Count VIII** is hereby **STRICKEN**.
18 Plaintiff shall file his Third Amended Complaint by October 24, 2011, if at all.



/s/ Frances M. Tydingco-Gatewood
Chief Judge
Dated: Sep 22, 2011

---

    These cases cover a variety of factual backgrounds and procedural settings, so they are *not* cited as evidence of any particular rule of law. Rather, they are simply cited as evidence of a correlation between claims of type (1) and claims of type (2).

Page 16 of 16